UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MAURICE T. HERRING,

      Petitioner,

v.                                                    Case No. 4:19cv386-WS-HTC

RICKY D. DIXON,[1]

      Respondent.

_____/

## REPORT AND RECOMMENDATION

      Petitioner, Maurice T. Herring, proceeding *pro se*, filed a petition under 28 U.S.C. § 2254 challenging his conviction in the circuit court of Leon County, Florida, for First Degree Murder in case 2010-CF-940, and raising three (3) grounds of ineffective assistance of trial counsel. ECF Doc. 1. The matter was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After considering the petition, the record, the State's response (ECF Doc. 21), and giving Petitioner an opportunity to

---

[1] Ricky D. Dixon succeeded Mark S. Inch as Secretary of the Florida Department of Corrections and is automatically substituted as the respondent. *See* Fed. R. Civ. P. 25(d). The clerk is directed to update the case file information to reflect Ricky D. Dixon as the Respondent.

reply, the undersigned recommends the petition be DENIED without an evidentiary hearing.

## I.    BACKGROUND

### A.    Offense and Conviction

Petitioner was convicted and sentenced to life imprisonment for the murder of Marvin Smith ("Smith"), who was shot at around 8 p.m. in the middle of the common area of an apartment complex (called alternatively Sunrise Apartments, Hollifield or Texas Street at trial). The evidence introduced at trial is summarized below.

The events leading up to the shooting began in the apartment of Mattishea James ("James"). James testified that Victoria Herring ("Victoria"), Petitioner's sister, who was living with James in the Sunrise Apartments, complained that her marijuana was missing and blamed Smith for taking it. ECF Doc. 21-4 at 232. Smith, who was also at James' apartment, denied taking the marijuana, and although Smith and Victoria got into an argument, both left James' apartment before anything physical occurred. *Id.* at 233. Smith then went to his friend, Maurice Williams' ("Williams"), house on Dozier Street and began playing video games. *Id.* at 262.

Warren Jordan ("Jordan"), Victoria's boyfriend testified the marijuana that was allegedly stolen was his. ECF Doc. 21-4 at 260-61. Jordan learned Victoria accused Smith of taking the marijuana in a text from a friend, Nita Green ("Green"). *Id.* at 261. Green, however, testified that Victoria "called me that morning and she

said that she had been jumped on and that her 'work' and her money had been stolen." (Green clarified that 'work' meant 'marijuana' in this context). ECF Doc. 21-5 at 27-28. Green also testified that, although Victoria did not look as though she had been involved in a fight, Victoria was upset and crying and spoke with her aunt, mother, and brother (the Petitioner). *Id.* at 28-29.

Jordan testified that, after hearing his marijuana had been taken, he went over to Williams' apartment and got into a confrontation with Smith, during which he "pistol whipped" Smith using a gun he noticed sitting next to Smith on the couch of Williams' apartment. ECF Doc. 21-5 at 263-67. After the fight, Smith insisted he did not steal the marijuana, and Jordan walked off and left the apartment. *Id.* at 267. Jordan also testified he did not have a 40-caliber weapon that day and that he did not fire any shots at anybody that day. *Id.*

Williams was called as a witness for the defense and described the events at his house differently. ECF Doc. 21-5 at 232. Williams testified that while Smith and several friends were at his house playing video games, Jordan called one of the individuals at the apartment and then came over. *Id.* at 234. When Jordan arrived, Smith let him into the apartment without getting up off the couch. *Id.* at 235-36. Jordan entered carrying a pistol. *Id.* Williams knew the pistol was Jordan's because he knew Jordan carried a 40-caliber pistol. *Id.* at 247-48. Jordan began hitting Smith over the head with the pistol, but it fell out of his hand and Williams picked it up

and hid it. *Id.* at 236. Smith and Jordan fought around the apartment, breaking a coffee table before the others broke up the fight. *Id.* at 237-38. Williams said that after the two stopped fighting, Jordan asked for his gun back while Smith went into a back bedroom. *Id.* at 238 and 242. Williams eventually gave Jordan his gun back, and Jordan aimed it at Williams before taking two shots in the direction of Williams' truck and leaving. *Id.* at 240-41. Williams testified that when Smith went to the back bedroom he retrieved his own gun, which was a 45-caliber pistol. *Id.* at 242.

Jordan returned to Sunrise Apartments and went to Green's apartment. Smith also returned to Sunrise Apartments, went to James' apartment, and told James about being hit in the head with a gun. Smith, however, did not tell James who hit him. ECF Doc. 21-4 at 233-34. The two walked out the door of James' apartment and were joined by another friend, walking down the sidewalk in the complex. *Id.* at 235. At some point, James "heard Victoria's voice, so [she] got like a bad feeling in [her] stomach" and turned around to return to her apartment. *Id.* at 236. James testified, "By the time I turned around, I heard the gun cock and I heard gunshots and I just started running." *Id.* She did not see the shooting. *Id.*

Witness Brittany Burton did see the shooting. She testified she was walking from the playground at the apartment complex when she heard a gun cock and saw Petitioner, who she knew personally "[j]ust from living out there for years," with a gun in his hand. ECF Doc. 21-4 at 245-46. Burton also testified she heard "Fuck-

nigger, you don't fuck with my sister". *Id.* at 257. Burton "went into the nearest apartment that was close" and watched the shooting from the window. *Id.* at 245-46. Looking out the window, Burton saw Petitioner shoot Smith, *id.* at 246, who did not have anything in his hands and was "[h]olding his hands up and I guess trying to talk his way out of getting shot." *Id.* She saw and heard Petitioner shoot Smith multiple times. *Id.*

Jordan also testified he witnessed some of the shooting. *Id.* at 258. He testified that after he returned to Green's apartment, he left to get a cigarette from a neighboring apartment and heard a shot. *Id.* at 271. He looked up and saw "Marvin reaching for Reese" and "Maurice shooting at Marvin." (Both "Reese" and "Maurice" referred to Petitioner, ECF Doc. 21-5 at 16). *Id.* Jordan testified Smith did not have anything in his hands and that, although "the first shot missed", "it was, like, he [Petitioner] just kept shooting." *Id.* Jordan testified he heard between seven and nine shots. *Id.* at 272. After the shooting, Jordan saw Petitioner "running toward the fence, like to exit the parking lot." *Id.* at 274. Jordan walked up to Smith and saw a gun "on his person." ECF Doc. 21-5 at 12. Jordan testified it was the same gun he had noticed at Williams' house that he used to pistol whip Smith. *Id.* at 12-13.

Green also testified that she witnessed Petitioner shoot the victim. *Id.* at 30-46. She was at her apartment with Victoria, who had just gotten off the phone with

her brother (Petitioner), and Jordan, who appeared upset and like he "had been in a scuffle or he had been in a fight." *Id.* at 30. She and Victoria walked outside and were standing there talking. *Id.* at 31. Jordan remained inside the apartment for a few moments. *Id.* at 32. Petitioner then came around from the playground area, asking where his sister was. *Id.* Victoria called out to him and started walking up the sidewalk towards him just as Smith came around the corner. *Id.* Green testified, "And Maurice already had the gun in his hand and as Marvin says, 'Bitch', Maurice raised the gun and says, 'F-nigger, I don't play about my sister.'" *Id.* at 33. Petitioner shot once, then again, and then Smith fell to the ground. After that, "Maurice walked toward him continuing to shoot his gun." *Id.* Green testified Smith did not have anything in his hands that Green knew of. *Id.*

Smith's brother testified he did not see the shooting but that he was called to the scene immediately afterwards. *Id.* at 69. He testified that upon seeing his brother's body, he noticed a "gun in his pocket" and "It was like the gun was just stuck in his pocket." *Id.* Smith's brother, not wanting Smith to get a gun charge if he lived, grabbed the gun and threw the gun in the "backyard" of the apartment complex. *Id.* at 71.

Syneda Francis testified that, on the night of the shooting, she was driving on Texas Street in a 2010 blue Ford Focus driven by a male friend. As she approached Sunrise Apartments, she saw Petitioner running on Texas Street. ECF Doc. 21-5 at

216.  She testified she knew Petitioner and was friends with him and his sister.  *Id.* at 215.  She had the driver stop to pick him up and noticed that Petitioner was "heavy breathing, like scared"; he said to himself, "I shot somebody.  I hope he ain't dead. I hope he ain't dead."  *Id.* at 219.  She also testified he said, "that nigger robbed my sister, and, I hope he ain't dead.  I shot him."  *Id.*

Defense counsel called Petitioner's girlfriend to testify that Petitioner arrived at her residence "around eight o'clock" the night of the shooting, alone and without a gun.  ECF Doc. 21-5 at 286.  She stated that he stayed "about 30 minutes" and that her apartment is "on the other side of town" from Sunrise Apartments.  *Id.* at 287.

### B.    Postconviction Procedural History and Timeliness

Petitioner filed a direct appeal (1D11-5176) of his judgment and sentence, and, on March 15, 2013, the First District Court of Appeal ("First DCA") affirmed *per curiam* without a written opinion.  *Herring v. State*, 109 So. 3d 209 (Fla. 1st DCA 2013).  Petitioner did not seek review from the Florida Supreme Court or file a petition for certiorari review with United States Supreme Court.  ECF Doc. 1 at 3-4.  Therefore, his conviction became final 90 days after the First DCA issued its opinion, on Thursday, June 13, 2013.  *See Bond v. Moore*, 309 F.3d 770, 773–74 (11th Cir. 2002) (holding a state prisoner's conviction becomes final when the U.S. Supreme Court denies certiorari, issues a decision on the merits, or when the 90-day period to file a petition for certiorari expires).

On February 7, 2014,[2] Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. ECF Doc. 21-6 at 20. That motion was continuously pending, until the First DCA affirmed the state court's denial of the motion and issued its mandate on May 7, 2019. *Herring v. State*, 268 So. 3d 106 (Fla. 1st DCA 2019). Petitioner filed the instant federal habeas petition on August 12, 2019. ECF Doc. 1 at 16. The Secretary does not dispute that the petition was timely filed.[3]

## II.   LEGAL STANDARDS

### A.   The Antiterrorism Effective Death Penalty Act ("AEDPA")

The AEDPA governs a state prisoner's petition for habeas corpus relief. 28 U.S.C. § 2254. Under the AEDPA, relief may only be granted on a claim adjudicated on the merits in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[2] *See* Habeas Rule 3(d) and *Houston v. Lack*, 487 U.S. 266, 275-76 (1988) (Under the "prison mailbox rule," a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing).

[3] Generally, under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner has one year from when the judgment becomes final to file an application for habeas relief. 28 U.S.C. § 2244(d)(1). Such time is tolled by the filing and pendency of post-conviction motions, such as a Rule 3.850 motion. 28 U.S.C. § 2244(d)(2). Here, only 339 days expired on the AEDPA clock.

28 U.S.C. § 2254(d).

This standard is both mandatory and difficult to meet. *White v. Woodall*, 572 U.S. 415, 419 (2014). "Clearly established federal law" consists of the governing legal principles set forth in the decisions of the United States Supreme Court when the state court issued its decision. *Id.*; *Casey v. Musladin*, 549 U.S. 70, 74 (2006) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of Supreme Court precedent if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams*, 529 U.S. at 406). "A state court's determination that a claim lacks merit precludes federal habeas relief so long

as fair-minded jurists could disagree on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011).

### B.    Ineffective Assistance of Trial Counsel Claims ("IATC")

As stated above, Petitioner raises three (3) grounds for relief, each premised on ineffective assistance of trial counsel.  An IATC claim requires a showing that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential.  *Id.* at 689.  The Petitioner bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.  *Id.* at 688-89

*Strickland*'s prejudice prong requires a petitioner to allege more than simply that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding."  *Strickland*, 466 U.S. at 693.  The Petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Bare allegations the Petitioner

was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

## III.    DISCUSSION

For the reasons set forth below, the undersigned finds Petitioner is not entitled to relief on any of the IATC claims raised. Each claim fails on its merits. Moreover, Ground Three is unexhausted.

### A.    Ground One: IATC for Failing to Investigate and Present a Florida "Stand Your Ground" Defense

Petitioner argues trial counsel was ineffective for failing to investigate, develop, and present a coherent defense based on Florida's "Stand Your Ground" law. ECF Doc. 1 at 20. Petitioner exhausted this claim by raising it in a 3.850 motion.

In the 3.850 motion, Petitioner claimed that when he first met with counsel, "he professed innocence or altogether refused to discuss the case" because everything was being recorded but gave counsel a list of potential witnesses that could help his case. ECF Doc. 21-6 at 94. Petitioner claims that later, "at one of his court appearances", Petitioner "told counsel that he wanted to use a stand your ground defense or self-defense because Marvin Smith pulled a gun on him first and that he feared for the safety of himself and that of his sister." *Id.* Petitioner claims counsel refused, and this resulted in a rift between counsel and Petitioner. *Id.*

Petitioner testified similarly at the evidentiary hearing. *See* ECF Doc. 21-8 at 191. He also testified he never told counsel he was somewhere else when the shooting occurred. *Id.* at 192. Additionally, Petitioner testified counsel did not want to raise the Stand Your Ground defense because he could prove someone else, Jordan, was the shooter. *Id.* at 194. Petitioner disagreed with this strategy because he was the one who shot Smith. *Id.*

Petitioner's trial counsel, Daren Shippy, also testified at the evidentiary hearing. ECF Doc. 21-8 at 230. Counsel testified Petitioner's "position was always that he was not there, flat out." *Id.* at 233. Instead, Petitioner was at someone's house playing Xbox. *Id.* Petitioner contended he was framed by Jordan and "was pretty excited" about the possibility of connecting the caliber of the firearm used to a gun Jordan regularly had. *Id.* at 234. Counsel denied ever being told by Petitioner that he was the shooter and shot Smith in self-defense. *Id.* at 237.

The State also entered into evidence a memorandum from trial counsel to Petitioner dated May 29, 2011, following up on the conference they had a few days earlier. *Id.* at 238. In the memo counsel recounts that the two "discussed [Petitioner's] version of events and the strategy to be employed at trial," including that Petitioner was in a car on his way to his girlfriend's house at the time of the shooting. ECF Doc. 21-6 at 153. Thus, as counsel put it, Petitioner's defense "is an alibi defense i.e., you were not at the scene of the crime at the time the crime was

committed." *Id.*  Counsel went on in the memo to explain that he has attempted to contact names of alibi witnesses given to him by Petitioner to "no avail", *id.,* and that there are several witnesses who have given statements placing Petitioner at the scene as the shooter.  *Id.* at 154.  Nonetheless, counsel also intended to try to argue Jordan was the shooter given his prior confrontation with Smith.  *Id.*  Counsel testified that at no time after the memo was sent did Petitioner tell counsel Petitioner was the shooter and wanted to put on a Stand Your Ground defense.  *Id.* at 239.

Based on the testimony and evidence presented at the evidentiary hearing, the state court denied relief under *Strickland*, finding that Petitioner never requested counsel to assert a Stand Your Ground defense.  The state court found counsel's testimony that no such strategy was discussed to be credible, particularly since it was supported by a detailed memo discussing the alibi defense.  Thus, the state court found "there was no failure to investigate, develop, and present a coherent defense." ECF Doc. 21-8 at 258-59.

"Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review."  *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011).  "Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'"  *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (per curiam) (quoting *Marshall v. Lonberger*, 459

U.S. 422, 434 (1983)), *cert. denied*, 568 U.S. 849 (2012).  The deference compelled by 28 U.S.C. § 2254(d) "requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." *Turner v. Crosby*, 339 F.3d 1247, 1273 (11th Cir. 2003) (quotation omitted).  Instead, "[i]n the absence of clear and convincing evidence, we have no power on federal habeas review to revisit the state court's credibility determinations." *Bishop v. Warden, GDCP*, 726 F.3d 1243, 1259 (11th Cir. 2013).

Petitioner has not presented any reason to undermine the state court's credibility determination, much less clear and convincing evidence to do so.  As the state court found, counsel's testimony that he and Petitioner discussed only an alibi defense is buttressed by the contemporaneous in time memorandum he wrote to Petitioner.  Petitioner, in fact, had no explanation for why counsel would have written in a memo the two had discussed an alibi defense if no such conversation occurred.  ECF Doc. 21-8 at 211.  Moreover, what Petitioner contends he told counsel has changed over time, further undermining the veracity of Petitioner's claim.

At the evidentiary hearing on Petitioner's 3.850 motion, Petitioner testified he told counsel he shot Smith "under a self-defense stand your ground law," and denied telling counsel he was somewhere else at the time of the shooting.  ECF Doc. 21-8 at 192, 211.  In the federal petition, however, Petitioner claims while he originally

told counsel he was not the shooter, he later admitted that he was, and told counsel then he wanted to pursue a Stand Your Ground theory.  ECF Doc. 1 at 19-20.  Thus, Petitioner has not rebutted the state court's determination with clear and convincing evidence.  To the contrary, Petitioner's changing account of events only further highlights the correctness of the state court's credibility determination.

Also, the evidence presented at trial was inconsistent with a claim of self-defense.  Thus, Petitioner could not have been prejudiced by trial counsel's failure to raise this defense.  First, several witnesses testified that Smith did not have a weapon.  *See, e.g.*, ECF Doc. 21-4 at 238, 246, 271; ECF Doc. 21-5 at 33.  Although two witnesses testified that the victim had a gun on him after he was shot, both testified that the gun was in his pocket or on his body, not drawn.  ECF Doc. 21-5 at 12-13, 69.  Second, Smith was shot eleven (11) times, with most of the shots occurring after the victim was on the ground, rolling around trying to avoid the shooter.  *See, e.g.,* ECF Doc. 21-5 at 35 & 272.  Third, witnesses testified Petitioner yelled something like, "you don't f* with my sister", ECF Doc. 21-4 at 257, or "I don't play about my sister", ECF Doc. 21-5 at 33, right before he shot Smith.  These statements show that Petitioner shot Smith to avenge his sister, rather than out of fear of harm to himself.  Finally, as discussed below, the witnesses Petitioner identified as supporting the self-defense theory were interviewed by counsel and

stated that they did not witness the shooting, so could not add anything to a self-defense theory at trial.

In sum, because the evidence was inconsistent with a self-defense theory, Petitioner has not shown there is a reasonable probability that, had counsel pursued such a theory, the result of the proceeding would have been different. Therefore, Petitioner fails to meet the prejudice prong of *Strickland*, *see id.*, 466 U.S. at 689, and is not entitled to habeas relief on this claim.

## B.   Ground Two: IATC for Failing to Have Defendant Evaluated for Competency

Petitioner argues "trial counsel was ineffective for failure to request an adequate competency evaluation" and, if such an evaluation were held, it would have shown "Petitioner attended slow learning classes while growing up"; "Petitioner was under the care of a psychiatrist while in Leon County Jail"; "Petitioner was on psychotropic medication while in Leon County Jail"; and "Based on Petitioner['s] slow learning and inability to understand certain proceedings, Petition[er] did not understand the nature of his charges." ECF Doc. 1 at 24. Petitioner raised this claim in the 3.850 motion and, thus, exhausted this claim.

The state court judge applied the *Strickland* standard and denied relief because, according to counsel, "there was no issue or no question in his mind that the defendant was competent." ECF Doc. 21-8 at 263. Petitioner's claim otherwise was merely "bare bones." *Id.* The state court's conclusion was not contrary to, and

did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

Petitioner cannot meet either prong of the *Strickland* standard on this IATC claim.  First, nothing in the record raises a bona fide doubt as to Petitioner's competency.  The legal test for mental competency is whether, at the time of trial and sentencing, the petitioner had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether he had "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  As the Eleventh Circuit has stated, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995).  Petitioner's claims of being in slow classes, having been diagnosed with depression, and being prescribed anti-depressive drugs fall far short of this standard.

Petitioner admitted at the evidentiary hearing he had never been diagnosed with a mental health illness before being in county jail, and at the jail was only diagnosed with depression.  ECF Doc. 21-8 at 203.  He admitted that neither he nor any of his family members "ever provide[d] any information regarding mental health problems [Petitioner] had" to counsel. *Id.* at 204.  Petitioner admitted he had never been Baker Acted, *id.* at 222, and had only seen a psychiatrist one time when he was

young, in order to be tested to be put in "behavior classes." *Id.* at 223. He testified he was given anti-depression medicine when he was in county jail but stopped taking it when he went to prison. *Id.* He further admitted he never requested a mental health evaluation. *Id.* Thus, nothing in the record gave counsel reason to request a competency hearing.

Petitioner also fails to show prejudice because he cannot show he would have been granted a competency evaluation. During the evidentiary hearing, counsel for the State asked Petitioner about the various roles of the judge, the prosecutor and counsel and asked about the charges and sentence Petitioner faced; Petitioner was able to intelligently answer. *Id.* at 224-25. Petitioner does not allege his mental condition changed over time, and his various pleadings throughout the case and his testimony in the evidentiary hearing show an understanding of the issues and procedures involved.

Also, trial counsel testified, "I never had the first bit of doubt about Mr. Herring's competency and I met with him multiple times" and "based on our multiple conversations and interactions, I had no concern about his competency." *Id.* at 245. The "'defendant's attorney is in the best position to determine whether the defendant's competency is suspect,' which means that the failure of counsel 'to raise the competency issue at [trial], while not dispositive, is evidence that [his] competency was not really in doubt and there was no need for a *Pate* hearing.'"

*Pompee v. Sec'y, Fla. Dep't of Corr.*, 736 F. App'x 819, 823 (11th Cir. 2018) (quoting

*Watts v. Singletary*, 87 F.3d 1282, 1288 (11th Cir. 1996)). Petitioner is not entitled

to habeas relief on this claim.

### C.    Ground Three: IATC for Failing to Call Witnesses Victoria Herring and Yves Saintyl to Support the "Stand Your Ground" Defense

Petitioner argues trial counsel erred by failing to call witnesses Victoria

Herring and Yves Saintyl to testify at trial. ECF Doc. 1 at 25. He contends "Mr.

Saintyl would have honestly testified that the victim initiated the confrontation and

that he pulled a gun on Mr. Herring" and that Victoria Herring would have testified

"the prosecutor's theory that Ms. Herring owned and w[as] robbed of drugs by the

victim was not accurate" and "earlier that day the victim made a threatening

comment and displayed a firearm." *Id.* at 25-26. The Secretary responds that

Petitioner did not exhaust this claim because he failed to raise the issue in the appeal

of the denial of his 3.850 motion.

A petitioner "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established

appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Petitioner raised this issue in the 3.850 motion, which was denied by the state court.

ECF Doc. 21-8 at 263. Petitioner, however, did not raise this issue in the initial brief

on appeal. *Id.* at 269. Instead, he only raised the issues presented here as Grounds

One and Two.  ECF Doc. 21-8 at 276 to 21-9 at 6.  Thus, the undersigned agrees with the Secretary that this claim is unexhausted.  *See Baker v. Dep't of Corr., Sec'y*, 634 F. App'x 689, 692 (11th Cir. 2015) (finding double jeopardy claim was not exhausted in state court because Baker abandoned it on appeal of his 3.850 motion's denial and, thus, did not raise the claim throughout one round of Florida's established appellate review process).

Even if Petitioner had exhausted this claim, he would not be entitled to federal habeas relief.  The state 3.850 judge applied the *Strickland* standard and denied relief on this ground because counsel testified when he spoke with Ms. Herring and Saintyl, neither had seen the shooting.  ECF Doc. 21-8 at 235.  Thus, not only did these witnesses, therefore, have no relevant information, but there was a chance these witnesses would place Petitioner at the scene, which was contrary to the alibi defense.  *Id.* at 246, 264.  Thus, as the state court found, "counsel made a sound trial strategy not to call her as a witness."  *Id.* at 263-64.

The state court's conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Decisions whether to call a particular witness are generally questions of trial strategy not amounting to ineffective assistance of counsel.  *See generally Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)

("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision and it is one that [the courts] will seldom, if ever, second guess.").

Second, Petitioner was not prejudiced by not calling these witnesses since neither saw the shooting and the overwhelming testimony at trial, as discussed above, was contrary to a self-defense argument. Therefore, no reasonable probability exists that calling these witnesses at trial would have resulted in a different outcome. Petitioner is not entitled to habeas relief on Ground Three.

## IV.   CONCLUSION

### A.   Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted. In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Additionally, this Court must take into account the deferential standards prescribed by § 2254. *See id.* Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing. *See Schriro*, 550 U.S. at 474.

### B.   Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of

appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing Section 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.      That the petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Herring*, 2010-CF-940, in the Second Judicial Circuit, in and for Leon County, Florida, ECF Doc. 1, be DENIED without an evidentiary hearing.

2.      That a certificate of appealability be DENIED.

3.      That the clerk be directed to close the file.

At Pensacola, Florida, this 20th day of January, 2022.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.